IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICIA BRIZZEE,

                          Plaintiff,                                CV-04-1566-ST

           v.                                           FINDINGS AND
                                                        RECOMMENDATION

FRED MEYER STORES, INC., a foreign
corporation,

                         Defendant.

STEWART, Magistrate Judge:

## **<u>INTRODUCTION</u>**

Plaintiff, Patricia Brizzee ("Brizzee") filed this action on October 28, 2004, alleging four

claims against her former employer, Fred Meyer Stores, Inc. ("Fred Meyer"). Brizzee alleges

four claims for: (1) violation of the Family Medical Leave Act ("FMLA"), 29 USC §§ 2901, *et*

*seq* ("First Claim"); (2) violation of the Oregon Family Leave Act ("OFLA"), ORS 659A.150-

186 ("Second Claim"); (3) common law wrongful discharge ("Third Claim"); and (4) intentional

infliction of emotional distress ("Fourth Claim"). Each of these claims stems from Fred Meyer's action of terminating Brizzee's employment on March 28, 2003.

This court has original jurisdiction over the federal statutory claim under 28 USC § 1331 and supplemental jurisdiction over the state law claims under 28 USC § 1367(a).

Fred Meyer has now filed a motion for summary judgment (docket #32), contending that Brizzee's claims are barred as a result of a release that Brizzee signed the day she was terminated. For the reasons stated below, that motion should be granted except as to the First Claim alleging a violation of the FMLA.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987). The

court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 631.

## DISCUSSION

### I. Undisputed Material Facts

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Brizzee. A review of the parties' facts, as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[1] reveal the following facts.

Fred Meyer hired Brizzee on March 22, 1998, and involuntarily terminated her employment on March 28, 2003.

Brizzee alleges that in September 2001, she supported a co-worker's claim for violation of the OFLA and was later threatened and intimidated to agree with Fred Meyer's position regarding the facts of the co-worker's allegations. Complaint, ¶ 10. Brizzee refused to do so and was then disciplined and retaliated against for that refusal. *Id* at ¶ 11-16.[2]

In 2003, Brizzee was working in Fred Meyer's Mail and Copy Center ("Mail Center"). In March 2003, Fred Meyer outsourced the operations of the Mail Center to an independent contractor, Lanier Professional Services.

---

[1] Both parties have submitted documents with various attachments. Citations to affidavits and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or page(s) of the deposition transcript.

[2] Fred Meyer disputes these allegations. Answer, ¶¶ 10-16. They do not affect the ruling on the pending motion for summary judgment, which involves only the issue of the effect Brizzee's act of signing a release on March 28, 2003, and are set forth here in abbreviated format only as background information.

On March 19, 2003, Fred Meyer officials met with Roy Dwiggins ("Dwiggins"), the labor representative of the Union, and discussed the effects of outsourcing on the Mail Center employees. Although not obligated to do so, Fred Meyer agreed to offer a severance package to Mail Center employees as part of the closure. The contemplated severance package was to be similar to one being offered to other employees whose jobs were being phased out. Dwiggins Depo, pp. 5-6, 9-11; Wojciechowski Depo, pp. 5-6; Weikel Depo, pp. 13-15.

While at work the morning of March 28, 2003, plaintiff became violently ill. She asked her lead, Cynthia Palmer ("Palmer"), and her supervisor, Merle Sherman ("Sherman"), if she could go home. Palmer and Sherman refused to let her do so. Brizzee spent the morning lying on the floor of a conference room or the bathroom and repeatedly vomiting. Brizzee Depo, pp. 12-13, 67-68, 78-79. She did not attempt to contact anyone outside of the Mail Center because she feared for her job. *Id* at 79; Brizzee Decl, ¶ 4. She thought she needed to go to the doctor. Brizzee Depo, p. 79.

At 1:00 p.m., Palmer and Sherman retrieved Brizzee from the conference room floor and told her she needed to attend a department meeting. Brizzee Decl, ¶ 5. At that meeting, Kroger Technology Director, Greg Weikel ("Weikel"), met with the 20-25 employees who worked in the Mail Center.[3] Weikel informed the employees that their services were no longer needed and that he would be meeting with each employee individually.

///

///

---

[3] There is some evidence that Carl Wojciechowski, Vice President of Human Resources (Brizzee Depo, p. 89), and Charles Washington, the Information Services Project Manager (Weikel Depo, p. 21), also attended this meeting.

*Id*, ¶ 6.  Severance agreements were not discussed at or available for review at the meeting.
Brizzee Decl, ¶ 6.[4]

Dwiggins was present during the group meeting.  However, Brizzee did not have an
opportunity to tell him she was ill.

Right after the group meeting, Weikel met with Brizzee individually in a closed-door
meeting.[5]  Weikel gave Brizzee a dislocated workers' package and another document addressed
to her, stating: "This is for your last paycheck, I know you are sick, go ahead and sign it."
Brizzee Depo, p. 69.  Weikel said nothing to Brizzee about signing a release or waiving any
claims, nor did he review the document with her.  Brizzee Decl, ¶ 8; Weikel Depo, p. 57.
Brizzee told Weikel she "just wanted to get through this" and signed the document.  Brizzee
Depo, p. 92.  After Brizzee signed the document, Dwiggins signed it on behalf of the Union.
Dwiggins Depo, pp. 24-25; Washington Depo, p. 66.

The document Brizzee signed was a two-page letter agreement dated March 28, 2003,
previously signed by the Vice President of Human Resources, Carl Wojciechowski
("Wojciechowski"), outlining the terms of a Separation Agreement being offered to dislocated
Mail Center employees.  Wojciechowski Depo, p. 17; Weikel Depo, p. 34; Brizzee Depo Ex 10.
Among other things, the letter agreement states that in consideration of a lump-sum payment in
an amount determined by the employee's length of service and certain other contributions by
Fred Meyer, including continued health insurance benefits, the employee agrees to "waive and

---

[4] Fred Meyer contends that employees at the group meeting were told that they would be presented with a severance agreement, could review it with an attorney, could refuse to sign it, and if they did sign it, would have an opportunity to revoke it.  Dwiggins Depo, pp. 16, 18, 29, 34; Washington Depo, p. 55; Weikel Depo, pp. 22-24, 27.

[5] Fred Meyer contends that Washington and Dwiggins were also present at this meeting.

release any and all claims" against Fred Meyer, including but not limited to claims under the Age Discrimination in Employment Act ("ADEA"), Title VII, ERISA, and any other federal or state or local or common law claims concerning employment. With respect to any claims under the ADEA, the agreement gives the employee the right to consult an attorney before signing, 21 days to consider the document, and seven days after signing to revoke it. It also states that the agreement may be accepted by the employee's signature, but is not effective or enforceable until seven days after signing.

Brizzee was given another copy of the letter agreement that had been signed by Wojciechowski prior to the meeting, but did not understand that document to be a copy of the one she had just signed. Brizzee Decl, ¶¶ 9, 11. She did not sign the copy given to her[6] and was unaware that she had signed a release until she obtained discovery from Fred Meyer in this case.[7] *Id*.

Following her meeting with Weikel, Brizzee drove 45 minutes to her parents' house. Brizzee Depo, pp. 69-70, 94-95. She left her child with her parents and went home to sleep, but about two hours later asked her parents to drive her to a hospital emergency room. *Id* at 70, 95-96. Brizzee told the nurse that she had been throwing up all day and had a stomachache. *Id* at 98. Brizzee signed, but did not read, hospital forms that the nurse explained to her. *Id* at 97; Brizzee Decl, ¶10. Brizzee was placed on an IV at the hospital and the hospital dispensed a

---

[6] That document is signed only by Wojciechowski, but part of Brizzee's first name appears on the signature line for Dwiggins and her full first name appears on the employee's signature line. Dwiggins Depo, Ex 2. Brizzee does not explain why her partial signatures appear on that copy.

[7] Brizzee's personnel file, which Brizzee's lawyer obtained prior to filing this lawsuit, did not contain either a signed or unsigned copy of the letter. Smith Decl, ¶ 7.

suppository.  Brizzee Depo, p. 99.  She was diagnosed with a virus and released later that night.  *Id*, Ex 16.

Brizzee did not feel better until four days later.  *Id* at 102.  At all times after her termination from employment, she had in her possession a copy of the letter agreement which she had partially signed, but was unaware that there was a fully executed original/copy of the letter.  She did not revoke the alleged Separation Agreement.  *Id* at 121-22.

Fred Meyer made deposits to Brizzee's bank account for her five weeks of severance payments, and Brizzee used the medical insurance following the end of her employment with Fred Meyer.  That medical insurance paid for surgery which she had in April 2003.  Brizzee Depo, pp. 109-10.  To date, Brizzee has not reimbursed Fred Meyer for the severance payments or medical insurance premiums.  *Id* at 126; Brizzee Decl, ¶ 12.

Brizzee is a high school graduate and has taken some college course work, but has only a third grade reading comprehension.  Brizzee Depo, pp. 10-12 & Ex 1; Brizzee Decl, ¶ 13 & Ex B.  However, before signing rental agreements, car purchase agreements, insurance agreements or other complex documents with legal consequences, she has her parents, or somebody else, review the documents and explain them to her.  Brizzee Decl, ¶ 13.  When she signed important documents during her employment, Fred Meyer gave her copies of the signed documents, and she generally asked her parents to explain the signed documents to her.  Brizzee Decl, ¶ 11; Washington Depo, p. 72; Smith Decl, Exs G & H.

///

///

///

**II.  Request for Reconsideration**

In its Reply, Fred Meyer asks this court to reconsider its denial of defendant's Motion to Strike Brizzee's factual submissions (docket #47).  Reviewing the docket, this court concludes that the lack of the documents in the file was likely attributable to a misfiling by this court. Accordingly, Fred Meyer's request for reconsideration is denied and this court will consider all submissions presently on file by Brizzee.

**III.  Enforceability of the Separation Agreement**

Brizzee does not dispute that it is her signature on the bottom of the letter addressed to her from Fred Meyer dated March 28, 2003, setting forth the terms of a Separation Agreement. However, she contends that the Separation Agreement is not enforceable for a variety of reasons.

**A.  Proper Signing**

First, Brizzee contends that the Separation Agreement is not properly signed.  This contention is based on Dwiggins's testimony that he understood he had to sign two copies of the Separation Agreement, with one signed copy given to Fred Meyer and the other signed copy given to the employee.  Dwiggins Depo, pp. 25-26.  Dwiggins did sign one copy, along with Wojciechowski and Brizzee, that was given to Fred Meyer, but did not sign the other copy of the Separation Agreement that Brizzee took with her when she left the meeting with Weikel. Brizzee Decl, Ex A.  As a result, Brizzee argues that the Separation Agreement was never properly signed because all parties signed only one copy and not both copies.

Brizzee's argument is premised on adding a condition to the Separation Agreement that it does not contain.  After the first four paragraphs recite Brizzee's termination of employment and

severance benefits which Fred Meyer agrees to pay her, the fifth paragraph in the middle of the

first page reads as follows:

> This letter sets forth the terms and conditions under which you agree to participate in this Separation Agreement. *You and your Union must sign and return this letter* in its entirety, which contains the release of claims against the Company, as evidence of your agreement to the terms and provisions of this Agreement in order to receive the above payments. Please read the rest of this letter carefully. Then, *both you and your Union sign the copy of this letter agreement* where provided on the last page *and return it* to Carl Wojciechowski, Group Vice President, Human Resources.

Brizzee Depo, Ex 10 (emphasis added).

By referring to the employee and the union signing both "this letter" and "the copy of this

letter agreement," Brizzee contends that the language is ambiguous and supports Dwiggins's

understanding. However, a close reading of the letter reveals that the parties are not required to

sign two letters and that only one full set of signatures is required.

"A contract is not ambiguous if it has only one sensible and reasonable interpretation."

*D & D Co. v. Kaufman*, 139 Or App 459, 462, 912 P2d 411, 412 (1996). Thus, for a contract "to

be legally ambiguous, it must be susceptible to at least two plausible interpretations when

examined in the context of the contract as a whole." *Anderson v. Divito*, 138 Or App 272, 278,

908 P2d 315, 320 (1996). In determining whether an ambiguity exists, the court may consider

parol and other extrinsic evidence. *Id*. Although the court must "pursue the intention of the

parties, if possible, ORS 42.230 requires construction of the contract as a whole, giving effect to

every word and phrase." *Id*. To determine intent, the court looks to the language of the contract

and other relevant circumstances. *Quality Contractors, Inc. v. Jacobsen*, 139 Or App 366, 370-

71, 911 P2d 1268, 1271, *review denied*, 323 Or 691, 920 P2d 550 (1996).

This court concludes that when examined in context and construed as a whole, the Separation Agreement is subject to only one plausible interpretation. It is simply unreasonable to infer, as Brizzee contends, that the copy that Brizzee had in her possession when she left work that day is the operative document.

The Separation Agreement nowhere expressly states that it consists of two original documents, both of which require signatures by all parties in order to be enforceable. Instead, it consists of both a cover letter and an agreement in one document. The cover letter portion, consisting of the first five paragraphs, advises the employee that: (1) both she and her union must sign and return the entire letter to Fred Meyer; (2) the employee should read the rest of the letter carefully; and (3) then the employee must sign on the last page and return the copy of the letter agreement to Wojciechowski. The remainder of the letter is the agreement itself.

To accept Brizzee's interpretation of the fifth paragraph, she would first sign the original letter, have her union sign, and return the fully signed original letter to Fred Meyer. Only then would she read the letter, sign a copy of the letter, have her union sign, and return the fully signed copy of the letter to Fred Meyer in order to accept the severance benefits. That interpretation is illogical for several reasons.

First, the paragraph above the employee's signature line states that: "I have carefully reviewed the foregoing agreement and have had the opportunity to confer with legal counsel." This clearly instructs the employee not to sign without first reading the agreement, which is contrary to Brizzee's interpretation of the fifth paragraph.

Second, there would be no need to return a fully signed copy of the letter to Fred Meyer once Fred Meyer already was given a fully signed copy. Nothing in the letter leads to the

conclusion that the fully signed one copy retained by Fred Meyer is contingent on receipt of a second fully signed copy. Consider a scenario where the employee signs and returns one copy, but decides not to sign the second one which she takes home. While awaiting receipt of the second copy, Fred Meyer would be left in a position of not knowing if and when it had an enforceable Separation Agreement. Even if the employee elected to sign and return the second signed copy, she may not do so until days, weeks, or even months later. The agreement clearly does not anticipate this possibility by failing to set forth any time limit for the employee to accept by returning a signed copy.

Finally, a copy of the letter signed by the employee would not be enforceable without the union's signature. Dwiggins testified that he did not sign until after the employee signed. Dwiggins Depo, p. 25. If the employee did not sign the second copy, then he would not have signed it either. Therefore, if the second copy needed a full set of signatures, the employee would have to obtain the union's signature before returning the signed copy to Fred Meyer. That is not how Diggins described the procedure. Instead, he testified that he signed both during the meeting with Fred Meyer and the employee, with one signed copy going to Fred Meyer and the other signed copy going to the employee. *Id* at 26.

Therefore, this court concludes that the letter is not ambiguous, but is susceptible to only one interpretation which requires only one full set of signatures on one copy to be enforceable.

### B. **Deceit and Duress**

Even if only one set of signatures was required to make the Separation Agreement effective, Brizzee also contends that a jury could reasonably conclude that she signed under duress. Oregon has long recognized that contracts entered under duress are not binding.

"Duress is unlawful constraint exercised upon a [person] whereby he [or she] is forced to do some act against his [or her] will." *Horn v. Davis*, 70 Or 498, 505, 142 P 544, 546 (1914). "[D]uress may be defined as a course of action or conduct which may actually or reasonably coerce the will of the party oppressed, and exists when the contract results from such coercion." *Id* at 506, 142 P at 546, quoting 1 Elliott on Contracts, p. 238.

"An agreement of settlement and release obtained from an injured person who acts without independent counsel or advice should be scrutinized with great care, and, upon proof of any fact or facts fairly tending to show fraud or unconscionable advantage in obtaining it, a jury would be warranted in finding such settlement to be of no effect." *Wood v. Young*, 127 Or 235, 243, 271 P 734, 737 (1928), quoting *Nielsen v. Portland Gas & Coke Co.*, 76 Or 505, 512-13, 147 P 554 (1915). Parties do not deal at arms length in settlement of a claim when the injured party has not received independent legal advice and "was not in a physical or mental condition to determine matters vitally affecting his welfare." *Peluck v. Pac. Mach. & Blacksmith Co.*, 134 Or 171, 178, 293 P 417, 420 (1930).

Brizzee had been at work for approximately five to six hours before she signed the Separation Agreement and had spent most of that time vomiting, laying on the bathroom floor and conference room floor and asking to go home. According to Brizzee, Weikel took her into a room, closed the door, and told her that if she signed the letter, she could receive her last check and leave. She told Weikel that she simply wanted to get things done so she could go home. Weikel did not tell Brizzee that she could have her check and leave if she did not sign the agreement. He did not have her final check with him, and even though he knew she was ill all

day, did not explain that she was signing a release of all claims. Shortly after signing the release, Brizzee ended up in the hospital.

Fred Meyer responds that Brizzee was not incapacitated from entering into an enforceable agreement because she elected not to leave work due to her illness for fear or retaliation and losing her job. Brizzee Decl, ¶ 4. "Incapacity or duress, without more, may [not] be inferred from merely the emotional and financial stress associated with loss of a job." *Melanson v. Browning-Ferris Indus., Inc.*, 281 F3d 272, 277 (1st Cir 2002). However, this case involves more than merely the stress associated with losing a job. When Brizzee signed the Separation Agreement, she was ill to the point of seeking medical attention only a short time later. Although she signed various forms at the hospital, she explains that, unlike Fred Meyer, the hospital explained the forms to her and answered her questions, that the forms were familiar to her, and that signing the forms was necessary to obtain medical treatment. Brizzee Decl, ¶ 10.

Brizzee was sufficiently ill to seek medical treatment, and Fred Meyer was aware that she was ill. Rather than transacting business with an extremely ill person, Fred Meyer could have allowed Brizzee to go home and come back later to sign the release when she felt better. Even had Brizzee read the letter before she signed it on March 28, 2003, she likely would not have understood its content given her illness. Based on these facts, a jury could reasonably conclude that Fred Meyer engaged in a course of conduct that actually or reasonably coerced Brizzee to sign the letter. Consequently, the court cannot conclude, as a matter of law, that Brizzee knowingly gave her assent to the Separation Agreement.

However, as discussed below, this court concludes that the Separation Agreement is enforceable because it was later ratified by Brizzee.

### C.  **Ratification**

Ratification occurs when the plaintiff, with full knowledge of the facts entitling her to rescind, "engages in unequivocal conduct giving rise to a reasonable inference that [s]he intended the conduct to amount to ratification."  *Wells v. Mix*, 266 Or 188, 192, 512 P2d 788, 790 (1973). Receipt of money or other benefits is not, in itself, ratification unless it is accepted after the employee knew or should have known that she had a case against his employer and the money was paid in satisfaction.  *Id.*  The question of whether ratification has occurred is, generally, a question of fact.  *Id.*

It is undisputed that at all times after March 28, 2003, Brizzee had in her possession a copy of the Separation Agreement which was signed only by Wojciechowski.  She read it at some point, although she is not sure when.  Brizzee Decl, ¶ 11.  She recovered from her illness by the fourth day after signing the original of the Separation Agreement given to Fred Meyer. Had she read her copy at that time, she would have seen the release language and her right to revoke within seven days.  Nevertheless, she claims that she had no reason to exercise her revocation right because she did not believe that she had signed the Separation Agreement and "based on experience, Fred Meyer generally gave [her] completely signed copies of any important employment documents."  *Id*.

However, Brizzee received benefits under the Separation Agreement consisting of five weeks of severance benefits and continued health insurance coverage.  Following her termination, she continued to receive direct deposits to her checking account from Fred Meyer on April 11, April 18, April 25, May 2, and May 9, 2003.  Declaration of Jennifer L. Bouman in

Support of Reply ("Bouman Reply Dec"), Ex B, pp. 7-8.  These deposits are labeled on her statements as "Fred Meyer Payroll" and are in about the same amounts as her previous wages from Fred Meyer.  Brizzee did not deposit funds from any other source into that account during that time, yet wrote checks and made withdrawals from the available funds.  *Id.*  Despite being unemployed, she also sought and received medical treatment a week after her termination in connection with her anticipated surgery and underwent surgery in April 2003, which was paid by her medical insurance from Fred Meyer.  Brizzee Depo, Exs 11, 16 & 17; Bouman Reply Decl, Exs A & B.

Had Brizzee not signed the Separation Agreement, her wages and health insurance benefits would have ceased as the end of March 2003.  She has provided no explanation as to how she received those benefits without knowing they were paid according to the terms of the Separation Agreement.  At the very least, she should have questioned why she continued to receive payments from Fred Meyer after her termination.  Acceptance of benefits under a settlement agreement without repayment is evidence of ratification.  *See Reinhardt v. Weyerhaeuser Timber Co.*, 144 F2d 278, 280-81 (9th Cir 1944) (holding that plaintiff ratified a settlement agreement for a personal injury claim by reading it after signing and accepting compensation payments); *Uherek v. Houston Light & Power Co.*, 997 F Supp 789, 795 (SD Tex 1998) ("Finally, plaintiff's retention of the benefits received in exchange for the Release ratified it; consequently, even if her proposed defenses, including duress, stress, and harassment had merit, which they clearly do not, they are precluded by ratification.").

Other evidence reveals that she did indeed know that she had signed a Separation Agreement.  On February 24, 2004, Dr. John R. Crossen, Ph.D., M.B.A., performed a

neuropsychological evaluation of Brizzee at the request of her vocational counselor.  Bouman

Reply Decl, Ex C.  That evaluation states as follows:

> She has been working with Oregon VRD for about eight months upon referral from Luahna Ede, Ph.D., her clinical psychologist.  She referred to herself as a displaced worker from Fred Meyer, where she was a mail clerk at the corporate office at 122nd and Powell.  *As part of her severance package* through Workforce Connections, she took computer classes at Mt. Hood Community College.
>
> \* \* \*
>
> Her severance package will last only another month, and she is worried about supporting herself after that.[8]

*Id* at 1-2 (emphasis added).

Therefore, Brizzee admitted that she had received a severance package upon her termination from Fred Meyer.  Furthermore, this was not her first severance package.  As that same evaluation states at a later point, when Strohecker's "was sold, she was let go with a severance package," after which she went to work at Fred Meyer.  *Id* at 3.  Since she knew what a severance package was prior to her termination from Fred Meyer, her admission to Dr. Crossen that she had obtained a severance package from Fred Meyer is credible and cannot be ignored.

Therefore, this court finds that even if Brizzee signed the Separation Agreement under duress, the undisputed facts reveal that she later ratified it by receiving and retaining the severance benefits payable by the Separation Agreement.  As a result, the Separation Agreement is enforceable and releases Fred Meyer from all claims "arising from or in any way related to" Brizzee's employment.

### D.  FMLA/OFLA Claims

---

[8] Although she had received the final severance payment from Fred Meyer for wages in May 2003, this reference to "another month" may refer to vocational services.  Although the Separation Agreement does not refer to vocational services, this admission nonetheless leads to the conclusion that Brizzee knew she was subject to a severance package, of which vocational services would have been only one part.

Although the Separation Agreement is enforceable, another issue arises as to whether it releases Brizzee's FMLA and OFLA claims. Brizzee's First Claim alleges that Fred Meyer violated the FMLA, "including her right to protected leave and her right to be [free] from retaliation for using FMLA leave." Complaint, ¶ 22. She adds that her "use of FMLA was a substantial factor in [Fred Meyer's] decision to terminate her employment, deny her a transfer and/or retain her at work on her last day of employment when she was so sick that she required hospitalization." *Id*. The Second Claim makes the same allegations to support an OFLA claim.

The Separation Agreement does not specifically mention or waive Brizzee's rights under either the FMLA and OFLA. However, it contains a catch-all provision waiving and releasing "any and all rights and claims" she had or may have had against Fred Meyer. The parties disagree as to whether this catch-all waiver applies to Brizzee's FMLA and OFLA claims.

1. **FMLA**

Neither the FMLA nor the OFLA prohibits the waiver and release of claims. However, 29 CFR § 825.220(d) provides that: "Employees cannot waive, nor may employers induce employees to waive, their rights under [the] FMLA." Brizzee contends that enforcement of the waiver in the Separation Agreement as to her FMLA claim is prohibited by this regulation. Fred Meyer responds that this regulation prohibits only the prospective waiver of substantive FMLA rights, and not the post-dispute claims for damages, such as alleged by Brizzee.

As support for its position, Fred Meyer cites *Faris v. Williams WPC-I, Inc.*, 332 F3d 316, 321 (5th Cir 2003), which held that a post-termination release did not bar an employee's claim against her employer for being fired in retaliation for asserting her rights under the FMLA. The Fifth Circuit found that several factors pointed to waiver of "rights under the FMLA" as

applying only to "substantive rights under the statute, such as rights to leave, reinstatement, etc., rather than to a cause of action for retaliation for the exercise of those rights." *Id* at 320. Those factors include the lack of reference in both the statute and regulation to a cause of action for damages as a "right" under the FMLA, as well as the title of the regulation and its examples of nonwaivability. "A plain reading of the regulation is that it prohibits prospective waiver of rights, not the post-dispute settlement of claims." *Id* at 321. The Fifth Circuit concluded that its interpretation was "bolstered by public policy favoring the enforcement of waivers" and the law under the ADEA and Title VII, noting no good reason "why the government would proscribe waiver for FMLA retaliation claims and yet favor waiver of claims for age discrimination claims under [the] ADEA and for civil rights violations under [T]itle VII." *Id* at 322.

However, the Fourth Circuit recently disagreed with *Faris* and concluded to the contrary that "the regulation's plain language prohibits both the retrospective and prospective waiver or release of an employee's FMLA rights. In addition, the regulation applies to all FMLA rights, both substantive and proscriptive (the latter preventing discrimination and retaliation)." *Taylor v. Progress Energy, Inc.*, 415 F3d 364, 368 (4th Cir 2005). In order to interpret the regulation, the court applied the analysis for determining the validity of regulations as set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837 (1984). First, it noted that the FMLA neither allows nor precludes the waiver or settlement of claims and therefore authorizes the Department of Labor ("DOL") to address the issue. Second, by turning to the definitions and common usage of the word "waive," the meaning and context of the regulation, and DOL's own understanding of the regulation, it concluded that the regulation makes no distinction between prospective and retrospective waivers. In particular, it noted that the DOL

considered and rejected proposed amendments that waivers and releases should be allowed in connection with post-dispute settlements of FMLA claims and "intended, by noting the parallels between the FMLA and the FLSA, to treat waivers under the FMLA differently from waivers under Title VII and the ADEA." *Id* at 372. Finally, under step two of the *Chevron* analysis, it concluded that the regulation is based on a permissible construction of the FMLA. Accordingly, it held that "without prior DOL or court approval, 29 CFR § 825.220(d) bars the prospective and retrospective waiver or release of the FMLA's substantive and proscriptive rights." *Id* at 375.

Because the Ninth Circuit has not yet addressed this issue, this court must decide whether to follow *Faris* or *Taylor*. This court is more persuaded by the thorough analysis and reasoning of the Fourth Circuit's decision in *Taylor* and similarly concludes that a waiver of Brizzee's FMLA claim is unenforceable absent DOL or court approval. Because Fred Meyer did not obtain DOL or court approval for the waiver, release or settlement of Brizzee's FMLA claim, the release of all claims in the Separation Agreement is not binding on Brizzee as to her First Claim alleging a violation of the FMLA.

### 2. OFLA

Oregon has not adopted any regulation similar to 29 CFR § 825.220(d) prohibiting waivers of OFLA claims. However, OFLA "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Family Medical Leave Act of 1993." ORS 659A.186. The problem is that the OFLA does not explicitly provide for or preclude the waiver or settlement of claims. Therefore, there is no "similar provision" of the FMLA to trigger any consistent construction of the OFLA.

In Oregon, the "legislative history of a federal act, as well as decisions construing its provisions, are persuasive in construing a state statute that adopts substantially the same terms as the federal act." *State v. Smith*, 66 Or App 703, 706, 675 P2d 510, 511 (1984) (citations omitted). "'In the absence of judicial construction, administrative construction is informative, and unless clearly at variance with the express terms of the statute, is entitled to respect.'" *Univ. of Or. Co-Op Store v. State Dep't of Rev.,* 273 Or 539, 544, 542 P2d 900, 903 (1975), *quoting Pac. Supply Co-op v. Ellis*, 224 Or 556, 560, 356 P2d 939, 941 (1960). In *Pac. Supply Co-op*, the issue was whether to apply the interpretation given by the Internal Revenue Service to a federal tax statute to an identical state statute. The court held that "the long history of administrative interpretation of the federal statute prior to its adoption in Oregon justifies an inference that the Oregon legislature intended to give the same statute the same effect in this state as it was then being given by the federal government." *Pac. Supply Co-op*, 224 Or at 560, 356 P2d at 941. However, an Oregon statute "cannot incorporate future federal regulations not yet promulgated at the time of the enactment; the effect of doing so is to delegate the power to amend the statute to the federal regulatory authority." *Advocates for Effective Regulation v. City of Eugene,* 160 Or App 292, 311-12, 981 P2d 368, 379 (1999) (citations omitted).

The OFLA was adopted in 1995 after the adoption of the FMLA in 1993. The two acts contain similar provisions, but certainly are not identical. Construing a similar statute, ORS 659A.139 ("ORS 659A.112 to 659A.139 shall be construed . . . consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended"), the Oregon Court of Appeals recently acknowledged that "[t]he question of the extent to which ORS 659A.139 requires us to interpret 'similar terms' in Oregon law in the same way those terms

have been interpreted by federal courts *and agencies* has not been decided in Oregon." *Stamper v. Salem-Keizer Sch. Dist.*, 195 Or App 291, 298-99, 97 P3d 680, 684 (2004) (footnote omitted) (emphasis added).

Given that the Oregon courts have not yet elected to use federal regulations as guidance in interpreting similar, but not identical, provisions in state statutes, this court is reluctant to do so. In addition, it does not appear that the Oregon legislature intended to empower the DOL to fill in any gaps in the OFLA. Instead, it authorized the Commissioner of the Oregon Bureau of Labor and Industries to adopt reasonable rules "[c]overing any other matter required to carry out the purposes of this chapter." ORS 659A805(1)(e).

Therefore, this court finds that the waiver and release in the Separation Agreement includes Brizzee's Second Claim alleging a violation of the OFLA.

### E. <u>Severability Clause</u>

The Separation Agreement contains no severability clause. In the absence of a severability clause, Brizzee argues that the catch-all waiver not only is ineffective as to her FMLA claim, but also is ineffective to release any of her other claims.

The absence of a severability clause is immaterial. Where an unenforceable provision is separable from the remainder of an otherwise enforceable contract, Oregon courts will sever the offending provision and enforce the remainder of the contract. *See, e.g., W.J. Seufert Land Co. v. Greenfield*, 262 Or 83, 87-89, 496 P2d 197, 199-200 (1952) (severing provision against public policy and enforcing the remainder of a guaranty contract). "[E]ven where the agreement is partly legal and partly illegal, if the legal may be separated from the illegal, the legal part will be enforced." *Eldridge v. Johnston*, 195 Or 379, 405, 245 P2d 239, 251 (1952).

Although the catch-all waiver is ineffective as to FMLA claims, there is no need to strike the entire provision in order to comply with 29 CFR § 825.220(d). It is only necessary to interpret the catch-all waiver as inapplicable to FMLA claims. This is no different than an invalid waiver of all defenses addressed by *W.J. Seufert Land Co*. Rather than void the entire provision or contract, the court concluded that "the more rational position is that . . . such a contract provision is only invalid when urged as a bar against a defense which may not be legally contracted away, while not invalid as a bar against a defense which may legally be the subject of such an agreement." *W.J. Seufert Land Co.,* 262 Or at 89, 496 P2d at 200. Adopting that same approach here, the catch-all waiver is invalid as to FMLA claims, but remains valid to bar all other claims.

///

///

///

///

///

///

///

///

///

///

///

///

## RECOMMENDATION

For the reasons stated above, Fred Meyer's Motion for Summary Judgment (docket #32) should be DENIED as to the First Claim alleging a violation of the FMLA and otherwise GRANTED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due February 17, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 31st day of January, 2006.

s/ Janice M. Stewart____
Janice M. Stewart
United States Magistrate Judge